**NATIONAL LABOR RELATIONS BOARD**
**v. AUSTIN CO.**
**No. 9402.**

Circuit Court of Appeals, Seventh Circuit.
Dec. 19, 1947.

BRIGGLE, District Judge, dissenting.

———◇———

A. Norman Somers, Asst. General Counsel, William T. Little, Atty., National Labor Relations Board, Gerhard P. Van Arkel, General Counsel, Morris P. Glushien, Associate General Counsel, and Fannie M. Boyls, Atty., National Labor Relations Board, all of Washington, D. C., for petitioner.

Edward J. McLaughlin, Harry L. Kinser, and McKnight, McLaughlin & Dunn, all of Chicago, Ill., for respondent.

Before KERNER and MINTON, Circuit Judges, and BRIGGLE, District Judge.

KERNER, Circuit Judge.

The National Labor Relations Board (hereinafter called the Board) is petitioning for enforcement of its order issued against respondent after proceedings under § 10 of the National Labor Relations Act.[1] The Board found that respondent's operations were subject to the terms of the Act, and that respondent had committed unfair labor practices in violation of § 8(1) and (3) of the Act.

The questions presented for our review are (1) whether the Act is applicable to respondent's operations; (2) whether the Board's findings of fact are supported by substantial evidence on the record as a whole; and (3) whether the Board's order is valid and proper.

Respondent is engaged in the business of designing and constructing office and industrial buildings throughout the United States, Canada, and other countries. To facilitate the operation of its business the respondent maintains fourteen offices in ten States and the District of Columbia, and has employees in several foreign countries. During the period mentioned in the complaint (September, 1945), its Chicago office, where the alleged unfair labor practices occurred, was engaged in designing and constructing buildings and structures in several States for numerous corporations. Specifically, the work of the Chicago office consisted of the determination of an appropriate design, the preparation of plans and blueprints, and the purchases of necessary construction materials for the erection of the desired building. At the commencement of construction a field force was sent out from the Chicago office to supervise the work. As the work progressed, lay-outs and blueprints were completed at the Chicago office and sent to the site of construction. The value of the design work performed by the Chicago office for the eighteen months preceding July 1, 1945 was over

---

[1] 29 U.S.C.A. § 151 et seq.

$400,000 and of this twenty-five per cent was performed for projects located outside of Illinois. The value of the materials purchased by the Chicago office during this same period was over $1,600,000 and it appears that a substantial portion of this was transported in interstate commerce to the site of construction.

Respondent contends that by the nature of its business it is not subject to the jurisdiction of the Board, because it is not engaged in interstate commerce within the purview of the Act. It argues that it is engaged in a purely local business of construction, which in this instance merely comprises a service leading up to construction work, although sometimes it does include the actual construction; that the primary nature of its business of construction is not altered by the fact that materials and men are gathered from outside the State wherein the construction work is performed. In support of its contentions, the respondent relies upon Schechter Corporation v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947; Carter v. Carter Coal Co., 298 U.S. 238, 56 S.Ct. 855, 80 L.Ed. 1160; National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352; and Santa Cruz Co. v. National Labor Relations Board, 303 U.S. 453, 58 S.Ct. 656, 82 L.Ed. 954. In each of these cases there is no doubt that the Supreme Court has examined minutely the power of Congress to extend federal control over activities which separately considered are intrastate. In the two earlier cases, neither of which considered the Act here involved, the Court found that the activities involved —operation of a slaughterhouse and coal mining—were of sufficiently local nature as to be excluded from any governmental regulation of interstate commerce. The two later cases, both of which were in consideration of the terms of the Act, widened the purlieus of interstate commerce regulation (without a rejection of the earlier cases) and set up the criterion "of degree" in the relation of interstate commerce to the activity under consideration. As the Court explained it in Santa Cruz Co. v. National Labor Relations Board, supra, 303 U.S. at page 467, 58 S.Ct. at page 661, 82

L.Ed. 954, "The question that must be faced under the act upon particular facts is whether the unfair labor practices involved have such a close and substantial relation to the freedom of interstate commerce from injurious restraint that these practices may constitutionally be made the subject of federal cognizance through provisions looking to the peaceable adjustment of labor disputes."

By a subsequent pronouncement in National Labor Relations Board v. Fainblatt, 306 U.S. 601, at page 604, 59 S.Ct. 668, 670, 83 L.Ed. 1014, the Court recognized the expansion of federal regulation over interstate commerce, and said: " * * * an employer may be subject to the National Labor Relations Act although not himself engaged in commerce. The end sought in the enactment of the statute was the prevention of the disturbance to interstate commerce consequent upon strikes and labor disputes induced or likely to be induced because of unfair labor practices named in the Act."

Any questions directed at the Board's jurisdiction then must be answered by placing the particular facts of each case against the possible obstruction of interstate commerce "induced or likely to be induced" by unfair labor practices.

In this case it is obvious that interstate commerce could be affected by industrial strife in the Chicago office. Any interference due to an unfair labor practice in the transmission of the blueprints in interstate commerce necessarily would retard construction and would disrupt the flow of building materials traveling in interstate commerce. This would constitute sufficient cause to bring respondent within the Act, because "Interstate communication of a business nature, whatever the means of such communication, is interstate commerce regulable by Congress under the Constitution." Associated Press v. National Labor Relations Board, 301 U.S. 103, 128, 57 S.Ct. 650, 654, 81 L.Ed. 953.

In considering the question of whether the Board's findings of fact are supported by substantial evidence, we are not unmindful of the recent enactment by Congress of the Labor Management Rela-

tions Act of 1947,[2] which, among other things, amended the National Labor Relations Act. Under § 10(f) of the original Act courts reviewing the orders of the Board were guided by the provision that "* * * the findings of the Board as to the facts, if supported by evidence, shall * * * be conclusive." Under § 10(f) of the amending Act the reviewing courts are now empowered to apply the test that "the findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall * * * be conclusive." While there is no doubt that it was the intention of Congress that the scope of the courts' reviewing power be broadened,[3] there is a question of how far the test to be applied should go. Certainly there is to be no trial de novo[4] and this quite definitely would seem to eliminate the doctrine of weighing the evidence. We are impelled to the conclusion that, in effect, the scope of our review under the new Act is only immaterially changed from the scope of our review under the National Labor Relations Act.

The findings of fact as set out by the trial examiner in his intermediate report were adopted by the Board as its findings. His conclusion that respondent had engaged in concerted activities in violation of § 8(1) and (3) of the Act was predicated upon the discharge by respondent of Arthur S. Brown. Brown, an electrical engineer, went to work for respondent about August 16, 1945, and was discharged upon September 14, 1945. The period of his employment with respondent covered a period of about four weeks. Brown was a member of the International Federation of Technical Engineers', Architects' and Draftsmen's Union (hereinafter called the union).

During the period in question, the keystone of respondent's office procedure was based on a method called the squad system. In the engineering department where Brown worked this was designed for the most efficiency and consisted of placing the engineers in groups of five or six and making them responsible to a squad leader. In the event questions arose regarding their work, it was the duty of the squad leader to answer them. If he could not, it was his further duty to get the answer. This is the system used by similar organizations, and in respondent's company it was tacitly recognized. There was evidence that Brown, as well as others, violated the squad system which, admittedly, was not perfect in practice. There was further testimony that Brown was argumentative and failed to fit into respondent's scheme of office routine. By themselves these facts would appear to constitute sufficient cause for discharge, but the trial examiner, while not overlooking them, concluded that the real cause for the discharge was to be found in Brown's union activities.

As stated, Brown belonged to the union during the tenure of his employment, and he testified that he spoke to about ten other engineers in the office of approximately sixty regarding joining the union and organizing the office force. Respondent urges that in view of this evidence the extent of the union activities involved were so minimal in nature that there can be no evidence of a bona fide labor dispute. Against this, however, is the episode leading up to the discharge, which indicates that respondent was aware of Brown's union activities and did not regard them as slight in nature.

At the time it hired Brown respondent was seeking a practical plan to eliminate night work, which was causing dissatisfaction among the employees. This problem was resolved favorably by Brown, who, despite the fact of his recent employment, initiated a petition regarding a new work week schedule which was signed by a majority of the employees and approved by respondent's management. Respondent's district engineer, Engle, upon discovering that Brown had authored the petition, discharged him. Brown testified that upon asking Engle why he was discharged, he was told that it was because he, a new man, had originated the petition and because he was attempting to organize a union among the men. Engle denied making such a state-

2 Pub.L.No.101, 80th Cong., 1st Sess. (June 23, 1947), 29 U.S.C.A. § 141 et seq.

3 Sen.Rep.No.105, 80th Cong., 1st Sess. (1947), note 7, p. 56.

4 Sen.Rep.No.105, 80th Cong., 1st Sess. (1947), p. 27.

596

ment. Respondent contends that to hold this as evidence that respondent was aware of Brown's organizing efforts is piling inference upon inference and hardly substantial. If we assume that Brown's version of his interview with Engle is correct (and the trial examiner in accepting it noted that Brown made a more favorable impression than Engle as a witness), it is reasonable inference that Engle was aware of Brown's union activities.

It is unquestioned that the Board has the exclusive right of drawing reasonable inferences from the facts. Interlake Iron Corporation v. National Labor Relations Board, 7 Cir., 131 F.2d 129, and Western Cartridge Co. v. National Labor Relations Board, 7 Cir., 139 F.2d 855. Moreover, there is evidence to the effect that two squad leaders were informed by Engle that they had stuck their necks out in signing the petition, which further substantiates the probability that respondent was aware of Brown's union activities. Brown's right to initiate the petition to improve working conditions and to propagandize on behalf of the union was protected under § 7 of the Act. The evidence is substantial in support of the Board's conclusion that Brown was discharged in violation of § 8(1) and (3) of the Act. National Labor Relations Board v. Schwartz, 5 Cir., 146 F.2d 773, and Indianapolis Power & Light Co. v. National Labor Relations Board, 7 Cir., 122 F.2d 757, 760.

The third question is whether the Board's order is valid and proper. Respondent is directed to cease and desist from discouraging membership in the union and from interfering with its employees in the exercise of their rights to self-organization. Respondent is further ordered to reinstate Brown and make him whole for any loss of pay, and, finally, it is ordered to post appropriate notices. Respondent contends that the order is too broad, in that only one employee was involved and hence there was no indication of a general anti-union discrimination. Under the view we take, the violations having been established, the number of employees involved is immaterial. Moreover, this court has held that to effectuate the policies of the Act the Board may, in

cases of violation of § 8(1) and (3), order reinstatement and with back pay. National Labor Relations Board v. Vail Mfg. Co., 7 Cir., 158 F.2d 664. We find no abuse in the Board's discretion.

The petition for enforcement of the order is granted.

BRIGGLE, District Judge (dissenting).

A study of the record leaves me with the profound conviction that the Board's finding that Brown was discharged on account of union activities is completely unreasonable, unjust and unsupported by substantial evidence on the record as a whole.