**EASTERN COAL CORPORATION v. NATIONAL LABOR RELATIONS BOARD.**

No. 5822.

United States Court of Appeals
Fourth Circuit.

Argued April 13, 1949.

Decided June 13, 1949.

William A. Stuart, Abingdon, Va. (George Richardson, Jr., Bluefield, W. Va., on the brief), for petitioner.

William J. Avrutis and Frederick U. Reel, Attorneys, National Labor Relations Board, Washington, D. C. (David P. Findling, Associate General Counsel, and A. Norman Somers, Assistant General Counsel, National Labor Relations Board, Washington, D. C., on the brief), for respondent.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

PARKER, Chief Judge.

This is a petition by the Eastern Coal Corporation to review and set aside an order of the National Labor Relations Board which found that that company had discriminatorily discharged[1] six supervisory employees in violation of the terms of the National Labor Relations Act and directed that they be reinstated with back pay. The case had been heard before a trial examiner, who recommended that the Board enter an order containing, not only the reinstatement and back pay provisions, but also cease and desist provisions requiring the company to abstain from interfering with the right of organization on the part of its supervisory employees. After the filing of the trial examiner's report, but before the entry of the order by the Board, the Labor Management Relations Act of 1947, 29 U.S. C.A. § 141 et seq., was passed; and the Board held that, because of that act, it was without power to incorporate the cease and desist provisions in its order but that it, nevertheless, had power to require and should require reinstatement with back pay of the discharged employees, since their discharge amounted to · an unfair labor practice under the statute in effect at that time. In its answer to the petition, the Board has asked that its order be enforced. Two distinct questions are presented for our consideration: (1) whether the Board's order is supported by "substantial evidence on the record considered as a whole", and (2) whether in view of the provisions of the Labor Management Relations Act there was power in the Board to enter it. We think that both these questions must be answered in the affirmative.

There was a lengthy hearing before the trial examiner at which the testimony ran to more than 1,600 pages, a large part of which has been quite unnecessarily printed in the appendix to the briefs. It was carefully summarized and appraised in the report of the trial examiner, and upon exceptions to his report, it was reviewed and analyzed in the Board's order. There is wide conflict not only in the testimony of the witnesses but also with respect to the conclusions and inferences which may be drawn from it; and the lengthy briefs of

---

[1] In the case of one of the employees the finding was that he was discriminatorily demoted and that a subsequent refusal to employ him because of an agreement relating to rank and file employees was discriminatory.

counsel are devoted in large measure to arguing questions of credibility and as to which of these inferences is the more reasonable. Our function, however, is not to pass upon questions of credibility nor to find facts from the testimony, but to determine whether the findings of the Board are supported by substantial evidence when the record is considered as a whole; and, as to this, we think there can be no doubt.

The company owns coal mines in Pike County, Kentucky, in which, prior to July 1, 1944, there had been organization of the rank and file labor but not of the supervisory employees. The rank and file labor had been organized by the United Mine Workers of America, and on or about the first of July 1944 the supervisory employees in two of the company's mines had organized a local union affiliated with that labor organization. The officials of the company announced a neutral attitude, but there is evidence that they were much opposed to having their supervisory employees organized by the labor organization which had organized their rank and file labor, that they refused to deal with a grievance committee of the supervisors union and stated that, whether or not they would recognize and deal with the union itself, would have to be determined by their bargaining agency and that they took steps to rid themselves of those who were prominent in the supervisors' organization. In this connection, there is evidence tending to show that Bernard Riddle and Tony Fanto were appointed about this time to the positions of mine superintendent and mine foreman, respectively; that they were urged by the general manager from time to time to discharge union men who were prominent in the union organization; that, when they failed to do so, they themselves were discharged; and that, following their discharge, there was a widespread rumor that they had been discharged for such failure, and that the supervisors union thereupon practically ceased to function.

Following the discharge of Riddle and Fanto on October 1, 1944, Rufus McKee was made superintendent, and between November 15, 1944 and February 18, 1945 he discharged the president and the treasurer of the supervisors union and three other supervisory employees who were members and demoted another supervisory employee who was a member. There is evidence that these men were competent and efficient, that they were miners of long experience, that most of them had served in a supervisory capacity for a long period of time and that their services were much needed. The grounds given for discharge were gross negligence and disobedience of orders; but there is abundant evidence that these charges were entirely unwarranted and were a mere pretext for getting rid of men whom the company desired to be rid of for some other reason which it wished to conceal. That this reason was the union affiliation of the discharged employees is a legitimate inference, not only because no other reasonable inference could be drawn from the facts as found by the Board, but also because of the antiunion attitude of McKee and the expressions which the Board found that he had used with respect to discharging members of the union.

To analyze in detail the circumstances surrounding each of the six discharges would unduly prolong this opinion; and there is no occasion to do so, as the facts are fully set forth in the report of the trial examiner and are reviewed in the order of the Board, where they may be read by those who are interested. There was evidence to support the position of the company, but it was for the Board, not us, to say what of the evidence was to be believed and what facts were established by it. The ultimate question in the case, the question as to the real reason for the discharges, was a question of fact for the Board; and, in the light of all the evidence, we cannot say that the Board's action was without substantial support. As we said in Hartsell Mills Co. v. N. L. R. B., 4 Cir., 111 F.2d 291, 293: "It must be remembered, in this connection, that the question involved is a pure question of fact; that, in passing upon it, the Board may give consideration to circumstantial evidence as well as to that which is direct; that direct evidence of a purpose to violate the statute is rarely obtainable; and that where the finding of the Board is supported by circumstances from

which the conclusion of discriminatory discharge may legitimately be drawn, it is binding upon the courts, as they are without power to find facts or to substitute their judgment for that of the Board."

See also N. L. R. B. v. Emery, 4 Cir. 173 F.2d 349; N. L. R. B. v. Norfolk Shipbuilding Co., 4 Cir. 172 F.2d 813; N. L. R. B. v. Harris-Woodson Co., 4 Cir., 162 F.2d 97; West Virginia Glass Specialty Co. v. N. L. R. B., 4 Cir., 134 F.2d 551, 552. In the case last cited this Court dealt with the complaint, repeated here, that the trial examiner almost invariably, in case of conflict, accepted the testimony of the Board rather than that of the company. We said: "In an effort to offset this evidence the petitioner contends that in the main the statements and conduct derogatory to the Flints attributed to the company's officials were denied by them; that in every instance of conflict the examiner and the Board rejected the testimony of the company's officials who were men of integrity and good repute and accepted the testimony presented by their adversaries; that the testimony of the latter was shot through with inconsistencies and improbabilities and lacked corroboration which must have been available if the testimony were true. These arguments might be pertinent and persuasive if we were considering the evidence in an equity case or the finding of a judge sitting without a jury in a case at law. In these cases it would be our duty to decide whether the findings were clearly erroneous, and if so, to reverse the judgment. But such is not our function in reviewing the findings of the National Labor Relations Board. In so doing it is beyond our power to resolve conflicts in the evidence or even to inquire whether the findings of the Board are so clearly erroneous that an injustice has been done."

We then quoted the following statement of the rule from N. L. R. B. v. Waterman S. S. Corp., 309 U.S. 206, 208, 209, 60 S.Ct. 493, 84 L.Ed. 704, which seems to be conclusive of the questions here involved: "* * * It is of paramount importance that courts not encroach upon this exclusive power of the Board if effect is to be given the intention of Congress to apply an orderly, informed and specialized procedure to the complex, administrative problems arising in the solution of industrial disputes. As it did in setting up other administrative bodies, Congress has left questions of law which arise before the Board —but not more—ultimately to the traditional review of the judiciary. Not by accident, but in line with a general policy, Congress has deemed it wise to entrust the finding of facts to these specialized agencies. It is essential that courts regard this division of responsibility which Congress as a matter of policy has embodied in the very statute from which the Court of Appeals derived its jurisdiction to act."

Counsel for the company argue that this rule has been changed by certain procedural provisions of the Labor Management Act of 1947 which modified the language of the earlier National Labor Relations Act, 29 U.S.C.A. § 151 et seq., in respect to the duties of the Board in the determination of controversies and the scope of judicial review of the Board's decisions by the courts. Thereby section 10(b) of the earlier Act, which provided that the rules of evidence prevailing in courts of law or equity should not be controlling, was stricken out, and it was provided that so far as practicable, the Board's hearings should be conducted in accordance with the rules of evidence applicable in the District Courts of the United States; and section 10(c) was amended so as to require the Board's decisions to be supported by "preponderance of the testimony taken"; and the review sections, 10(e) and 10(f), were modified so as to provide that "the findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall in like manner be conclusive." 29 U.S.C.A. § 10 (b, c, e, f).

These changes as the Committee Reports[2] clearly show, were inspired by the dissatisfaction of Congress with decisions

_____

[2] Sen.Rep.No.105, 80th Cong. 1st Sess. 26-27 (1947); H.R.Rep.No.510, 80th Cong. 1st Sess. 56 (1947); H.R.Rep.No. 245, 80th Cong. 1st Sess. 41 (1947). The House Bill empowered the courts to set aside findings of fact which they found to

of the Board in certain cases and with the inability of the courts to correct them; and it was believed by some persons that the new Act broadened the scope of judicial review and conferred upon the courts power to correct mistakes committed by the Board in its findings of fact as well as in its conclusions of law. We are unable, however, to find that this result was accomplished. See N. L. R. B. v. Austin Co., 7 Cir., 165 F.2d 592, 595; N. L. R. B. v. Crompton-Highland Mills, Inc., 69 S.Ct. 960. That the Board was cautioned to observe the usual rules of evidence and to consider the whole record and to base its findings upon the preponderance of all of the evidence is undeniable; and the courts themselves were directed to determine whether the Board's findings of fact were supported by substantial evidence in the record considered as a whole. But findings so supported are still conclusive upon the courts since the critical words selected by Congress for the guidance of the courts are the existence of "substantial evidence" to support the Board's findings and these are the same words which the Supreme Court has defined in this very context to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. v. N. L. R. B. 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126; N. L. R. B. v. Columbian Enameling & Stamping Co. 306 U.S. 292, 300, 59 S.Ct. 501, 83 L.Ed. 660. In the cases cited the court was construing the provision of the National Labor Relations Act. In the Consolidated Edison case, it said: "We agree that the statute, in providing that 'the findings of the Board as to the facts, if supported by evidence, shall be conclusive,' section 10(e), 29 U.S.C.A. § 160(e), means supported by substantial evidence. Washington, V. & M. Coach Co. v. National Labor Relations Board, 301 U.S. 142, 147, 57 S.Ct. 648, 650, 81 L.Ed. 965. Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

Our conclusion is that although the Board is warned to decide labor controversies upon the whole record and in accordance with the preponderance of the evidence, the court in reviewing the decisions is not empowered to weigh one bit of evidence against another with a view of determining which it will accept as true or to substitute its judgment for that of the Board in determining what ultimate facts are established by the circumstances in evidence. The court reviews the findings of the Board as it reviews the findings of a jury on a motion n. o. v., that is to say, the findings, like the verdict, must stand if there is substantial evidence in the record to support them. N. L. R. B. v. Crompton-Highland Mills, supra; N. L. R. B. v. Columbian Enameling & Stamping Co. supra, 306 U.S. 292, 300, 59 S.Ct. 501, 83 L.Ed. 660. In Appalachian Electric Power Co. v. N. L. R. B. 4 Cir., 93 F.2d 985, 989 (cited with approval by the Supreme Court in the Consolidated Edison and Columbian Enameling & Stamping Co. cases, supra), we stated the substantial evidence rule as follows: "We are bound by the Board's findings of fact as to matters within its jurisdiction, where the findings are supported by substantial evidence; but we are not bound by findings which are not so supported. 29 U.S.C.A. § 160(e) (f); Washington, Virginia & Maryland Coach Co. v. National Labor Relations Board, 301 U.S. 142, 57 S.Ct. 648, 650, 81 L.Ed. 965. The rule as to substantiality is not different, we think, from that to be applied in reviewing the refusal to direct a verdict at law, where the lack of substantial evidence is the test of the right to a directed verdict. In either case, substantial evidence is evidence furnishing a substantial basis of fact from which the fact in issue can reasonably be infer-

---

be "against the manifest weight of the evidence" but the Senate Bill did not and that provision was eliminated in the Act as finally passed. In explaining the Conference Report Senator Taft said that "the Senate conferees * * * insist-

ed that the Senate rule on court review be accepted as the conference agreement." See 93 Cong.Rec. 6444; Cox, Some Aspects of the Labor-Management Relations Act, 1947, 61 Harv.L.Rev. 1, 39.

red; and the test is not satisfied by evidence which merely creates a suspicion or which amounts to no more than a scintilla or which gives equal support to inconsistent inferences. Cf. Pennsylvania R. Co. v. Chamberlain, 288 U.S. 333, 339-343, 53 S.Ct. 391, 393, 394, 77 L.Ed. 819. If the case had been tried at law, we should unhesitatingly hold that verdict should have been directed against a finding of discrimination or interference, on the ground that no sufficient evidence to that effect had been produced; and for the same reason we must set aside the order of the Board based on such a finding."

■ We come then to the second question: whether the Board had power to enter the reinstatement and back pay order, in view of the change in the law effected by the Labor Management Act of June 23, 1947 with respect to the rights of supervisory employees. Section 101(3) of Title 1 of that Act, 29 U.S.C.A. § 152(3) excluded from the definition of employee "any individual employed as a supervisor"; and thus amended the National Labor Relations Act under which supervisory employees had been guaranteed the right of collective bargaining and accorded the full protection given other employees. Packard Motor Co. v. N. L. R. B., 330 U.S. 485, 67 S.Ct. 789, 91 L.Ed. 1040. The effect of this amendment was to deprive the Board of power to treat supervisory employees as employees within the protection of the statute as to matters subsequently arising; but we do not think that its effect was to take away redress for unfair labor practices perpetrated against supervisory employees prior to its enactment. The right to afford relief in such cases was preserved, we think, by the general saving statute, 1 U.S.C.A. § 29, which provides: "The repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing Act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability."

■ At the time of the discharges here involved, and at the time proceedings before the Board were commenced, the supervisory employees who were discharged were protected by the National Labor Relations Act and their discharge constituted an unfair labor practice forbidden by the act. In discharging them, the company incurred a liability under the law as it then stood, a liability to take such action as the Board might order to remove or avoid the consequences of the violation of the act, "including reinstatement of employees with or without back pay". Cf. Consolidated Edison Co. v. N. L. R. B. 305 U.S. 197, 235, 236, 59 S.Ct. 206, 219, 83 L.Ed. 126. It is true, of course, that a reinstatement or reimbursement order is not a redress for a private wrong (Virginia Electric & Power Co. v. N. L. R. B. 319 U.S. 533, 543, 63 S.Ct. 1214, 87 L.Ed. 1568); but it does not follow that liability for redress of the public wrong involved is not one of the matters preserved by the general saving statute. An incident of the redress of the public wrong is the reinstatement and reimbursement order, which "does restore to the employees in some measure what was taken from them because of the Company's unfair labor practices." 319 U.S. at 543, 63 S.Ct. at 1220. We see no reason why the liability which was incurred prior to the change in the statute should not be enforced by the entry of such an order. As said in Phelps Dodge Corporation v. N. L. R. B., 313 U.S. 177, 197, 61 S.Ct. 845, 854, 85 L.Ed. 1271, 133 A.L.R. 1217, "making the workers whole for losses suffered on account of an unfair labor practice is part of the vindication of the public policy which the Board enforces".

It is said that because supervisory employees are no longer protected by the Act, there is no public policy which requires their reinstatement, even though their discharge constituted an unfair labor practice at the time. We think that this is to take too narrow a view of the public policy involved. The supervisory employees were discharged for exercising rights which the statute at that time guaranteed them. Whatever changes may have been made in the Act, the public policy

which it embodies certainly requires that relief be accorded for unfair labor practices and that employees wrongfully discharged through such practices be restored to their positions with reimbursement of the loss that they have sustained as a result thereof. The fact that the company may no longer be required to bargain with the supervisors union is no reason why the supervisors who have been wrongfully discharged should not be restored to their positions with reimbursement of their loss.

The question raised is not one of first instance. The decisions of Courts of Appeals of three other Circuits are in accord with our holding here. See N. L. R. B. v. National Garment Co., 8 Cir., 166 F.2d 233, 237; N. L. R. B. v. Mylan-Sparta Co. 6 Cir. 166 F.2d 485, 488; N. L. R. B. v. Gate City Cotton Mills, 5 Cir., 167 F.2d 647, 649; N. L. R. B. v. Edward G. Budd Mfg. Co., 6 Cir., 169 F.2d 571, 575, cert. den. Forman's Ass'n of America v. Edward G. Budd Mfg. Co., 335 U.S. 908, 69 S.Ct. 411. In the case first cited, Judge Woodrough, speaking for the Court of Appeals of the Eighth Circuit, argues the question out with full citation of the cases construing the general saving statute. He says: "The term 'liability' as used in the general savings statute has been broadly construed by the courts to comprehend all obligations arising out of any breach of a statutory duty. The obligations of employers arising out of violations of the National Labor Relations Act are clearly 'liabilities' within the meaning of the general savings statute, as it has been consistently interpreted. Under that statute such liabilities continue to have binding effect, notwithstanding the passage of the amendment, unless Congress manifested therein an intention to extinguish such liability. But clearly Congress made no provision in the amendment for absolving employers of liability for unfair labor practices committed prior to such amendment. Indeed, the legislative history indicates a contrary intent, for Congress expressly considered and rejected a proposal which would have had the effect of prohibiting entry by the Board or enforcement by the courts of any order based on prior unfair labor practices unless the conduct involved continued to be an unfair labor practice under the amending statute."

And we think that the question has been decided by the Supreme Court in the case of Budd Mfg. Co. v. N. L. R. B., 332 U.S. 840, 68 S.Ct. 262, 92 L.Ed. 412, wherein it limited the writ of certiorari to the cease and desist provisions of an order relating to supervisory employees and refused to interfere with the order in so far as it directed reinstatement with back pay of a discharged supervisory employee. The Court of Appeals of the Sixth Circuit so construed the Supreme Court's order of remand, and the subsequent denial of certiorari would indicate that this was correct. The Court of Appeals said (169 F.2d at 575): "We think it is equally clear that paragraphs 2(a) and 2(b) of the order dealing with the reinstatement of Oscar Owens are not before us for reconsideration. The respondent has fully complied with those provisions of the order. They deal with the past rather than with the future. The general savings statute, 1 U.S.C.A. § 29, provides that the repeal of a statute will not release any liability incurred under such statute unless the repealing act shall so expressly provide. The respondent's obligation to Owens under the Board's order was a liability under the National Labor Relations Act before the Amendment of 1947. The amendment contains no provision for relieving an employer from any liability arising out of any unfair labor practice committed prior to the passage of that Act."

For the reasons stated, the petition to set aside the order of the Board will be denied and the order will be enforced.

Petition denied and order enforced.